fIN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MCGARRY & MCGARRY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16 CV 8914 |
| | ) | |
| BANKRUPTCY MANAGEMENT | ) | |
| SOLUTIONS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

COMPLAINT

Plaintiff McGarry & McGarry, LLC ("McGarry"), by its undersigned attorneys, on behalf of itself and those similarly situated, for its complaint against defendant Bankruptcy Management Solutions, Inc. ("BMS"), alleges:

Nature of this Action

1.  McGarry is bringing this action because BMS has conspired with its two largest competitors to fix the manner of charging Chapter 7 Bankruptcy Estates ("Estates") for bankruptcy software services.  This conspiracy violated the Sherman Act, 15 U.S.C. § 1, and the Illinois Antitrust Act, 740 ILCS 10/3.  Through this conspiracy, that one Trustee has termed a "train robbery," BMS has unlawfully extracted excessive, if not exorbitant, fees from Estates, and cheated creditors out of millions of dollars.

Jurisdiction and Venue

2.  This Court has subject matter jurisdiction over the first claim in this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) because it arises under 15 U.S.C. §§ 1 and 15.  The Court has subject matter jurisdiction over the second claim in this action

pursuant to 28 U.S.C. § 1367 because that claim is so related to the claim within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution of the United States.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because this Court has personal jurisdiction over BMS.

4.      This Court has personal jurisdiction over BMS pursuant to 735 ILCS 5/2-209 because the claims asserted in this action arise out of BMS's transaction of business in this State.

<u>The Parties and the Principal Actors</u>

5.      BMS is a corporation organized and existing under the laws of the State of California, with its principal place of business in Irvine, California.  BMS is the largest provider of bankruptcy software services in the United States.  In addition to bankruptcy software services, BMS also provides ancillary services, such as data entry or check preparation.

6.      Epiq Systems, Inc. ("Epiq") is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business in Kansas City, Kansas.  Epiq is the largest competitor of BMS in the national market for bankruptcy software services.

7.      TrusteSolutions, a division of Financial Software Solutions, LLC ("TrusteSolutions"), is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business in Houston, Texas. TrusteSolutions is a smaller competitor of BMS in the national market for bankruptcy software services.

8. Rabobank, N.A. ("Rabobank") is a banking corporation organized and existing under the laws of the United States, with its principal place of business in Roseville, California. Rabobank is, and since about November 2012 has been, the bank in which BMS has required Chapter 7 Bankruptcy Trustees ("Trustees") using BMS bankruptcy software services to deposit all, or substantially all, of the funds of the Estates that they administer.

9. Eugene Crane ("Crane") is a member of the Panel of Chapter 7 Trustees in this District. As a Trustee, Crane entered into contracts with both BMS and Rabobank.

10. McGarry is a limited liability company organized and existing under the laws of the State of Illinois, with its place of business in Chicago, Illinois. McGarry is a law firm, and was a creditor of an Estate that Crane administered.

Background of this Action

A.    Chapter 7 of the Bankruptcy Code

11. The filing of a petition under Chapter 7 of the Bankruptcy Code creates an Estate. An Estate, in general terms, consists of the property of the debtor at the time of the filing of the petition.

12. Upon the filing of such a petition, the Office of the United States Trustee, a Division of the United States Department of Justice ("U.S. Trustee"), appoints a Trustee to administer the Estate.

13. The Trustee is a fiduciary charged with protecting the interests of the Estate. The principal duty of the Trustee is to collect and liquidate property of the

3

Estate and to distribute the proceeds to creditors. The Trustee also has a duty to make certain reports concerning the Estate to the U.S. Trustee and to the Bankruptcy Court.

B.  The National Market for Bankruptcy Software Services

14.  Upon information and belief, since 1987, BMS has provided bankruptcy software services to assist Trustees in meeting their reporting and other obligations. Upon information and belief, BMS began as a spin-off of a bank that had provided free bankruptcy software services to Trustees in exchange for their deposits of Estate funds at the bank.

15.  Upon information and belief, before 2000, BMS developed software to assist Trustees in meeting their reporting and other obligations. Upon information and belief, BMS secured copyright protection in this software, exercised reasonable precautions to preserve the confidentiality of the source code for this software, and updated this software over time. Upon information and belief, the competitors of BMS have developed and maintained comparable software.

16.  BMS has acquired market power – meaning the power to control prices – in the market for bankruptcy software services to Trustees. The standard contract of BMS with a Trustee allows BMS to set its fee, in BMS's discretion, at any amount permitted by law. The standard contract of BMS with a Trustee provides:

> "As permitted by law or your applicable regulatory authority, BMS, Bank or Financial Institution shall have the right to charge your account with a service fee via ACH debit or otherwise. **Such fee shall be determined by BMS in its sole discretion**, provided however, such fee shall in no case exceed the maximum service fee permitted by law or your applicable regulatory authority and shall be debited to your account(s) on a monthly basis for the preceding month." (Emphasis added.)

17.     BMS has limited competition in the national market for bankruptcy software services.  Upon information and belief, as measured by the number of Trustees in the United States, BMS has more than a 50 percent share, Epiq has about a 35 percent share and TrusteSolutions has less than a 15 percent share of the national market for bankruptcy software services.  Upon information and belief, Trustees do not, at any one time, use more than one bankruptcy software service provider.

18.     BMS requires its Trustees to deposit all, or substantially all, of the funds of the Estates they administer using BMS bankruptcy software services at a bank that BMS designates.  Upon information and belief, at all relevant times in or before about November 2012, BMS required its Trustees to deposit funds of the Estates they administered using BMS bankruptcy software services at Bank of New York Mellon.  Upon information and belief, at all relevant times after about November 2012, BMS required its Trustees to deposit funds of the Estates that they administered using BMS bankruptcy software services at Rabobank.  Upon information and belief, Rabobank now holds all of the funds of the Estates of each Trustee that uses BMS bankruptcy software services to administer an Estate.  Upon information and belief, Rabobank currently holds about $2,000,000,000 in deposits from Trustees who contract with BMS.

C.     Charging Fees for Combined Bankruptcy Software Services and
        Bankruptcy Banking Services Based Upon the Amount of Money in the Estate

19.     Prior to the financial crisis that began in 2008, BMS did not charge fees for bankruptcy software services directly to any Estate.  Rather, BMS directed the Trustees to deposit all of the funds of the Estates they administer in a selected bank, the bank would earn money from the deposits of the Estates, and the bank would pay BMS a fee. The bank would then pay interest to the Estate.

20.     As a result of the financial crisis that began in 2008, interest rates declined.  As a result of this decline in interest rates, the amount of money that the bank could earn from the deposits of the Estates also declined, as did the bank's ability to pay BMS a fee.

21.     Before January 2011, to increase its profits without providing any additional services, BMS considered directly charging Estates a fee for bankruptcy software services.

22.     Upon information and belief, BMS considered charging that fee to Estates in different ways, including on a (a) per Trustee basis, (b) per case basis, and (c)  per transaction basis, such as per report generated.  However, upon information and belief, BMS never charged a fee to any Estate or Trustee in any of these ways.

23.     Before January 2011, BMS considered a non-traditional way of charging its fees for bankruptcy software services.  Specifically, BMS considered selling bankruptcy software services only in combination with bankruptcy banking services and directly charging Estates a fee for those combined services based upon a percentage of the money in the bank account of the Estate.

24.     Upon information and belief, BMS preferred this non-traditional way of charging fees over the alternatives that BMS had considered.  This non-traditional way of charging fees would mask the extent to which BMS, as opposed to its bank, ultimately received the fees.  This non-traditional manner of charging fees would also make it more difficult for the Trustees to determine whether the fee in any case was modest, reasonable, or excessive.

25.     Upon information and belief, BMS understood that the marketplace would accept this non-traditional manner of charging fees if, and only if, the three major providers of bankruptcy software services – BMS, Epiq and TrusteSolutions – did not charge for bankruptcy software services separately from the bankruptcy banking services.

D.     The Conspiracy to Fix the Manner of Charging Fees

26.     In or before January 2011, BMS proposed to Epiq and TrusteSolutions that they, *inter alia*, sell bankruptcy software services only in combination with bankruptcy banking services, and charge no fee to an Estate for those combined services other than a percentage of the amount in the bank account of the Estate.

27.     Epiq and TrusteSolutions each accepted this proposal of BMS, as detailed in paragraphs 55 to 81 below.

E.     The Change in the Rule to Allow Trustees to Pay Bank Fees

28.     Before January 2011, BMS understood that although the Bankruptcy Court had authority to approve actual and necessary administrative expenses, charging an Estate a fee for combined services could violate the rule of the U.S. Trustee that prohibited Trustees from paying bank fees from Estate accounts.

29.     BMS, Epiq and TrusteSolutions requested in or before January 2011 that the U.S. Trustee suspend that rule, and allow Trustees to pay bank fees from Estate accounts.

30.     On or about April 29, 2011, the U.S. Trustee suspended its rule prohibiting Trustees from paying bank fees from Estate accounts.  The U.S. Trustee, however, did

not approve any amount, or rate, for those fees, and did not approve any manner of charging those fees.

F.     Execution of the Conspiracy to Fix the Manner of Charging Fees

31.     After the U.S. Trustee suspended its rule prohibiting Trustees from paying bank fees from Estate accounts, BMS, Epic and TrusteSolutions reaffirmed their conspiracy described in paragraph 26 above.

32.     After April 29, 2011, BMS, Epic, and TrusteSolutions acted on their conspiracy to sell Estates bankruptcy software services only in combination with bankruptcy banking services, and to charge no fee to an Estate for those combined services other than a percentage of the amount in the bank account of the Estate.

33.     After April 29, 2011, BMS and its selected bank entered into agreements with Trustees that required an Estate to pay a combined fee for bankruptcy software services and bankruptcy banking services based upon a percentage of the money in the account of the Estate.

34.     After April 29, 2011, BMS and its selected bank then began deducting as a fee for those combined services a percentage of the money in the bank account of the Estate.

35.     Upon information and belief, after April 29, 2011, neither BMS, Epiq nor TrusteSolutions has consistently charged a fee for bankruptcy software services on a (a) per Trustee basis, (b) per case basis, or (c) per transaction basis, such as per report generated.

36.     Upon information and belief, pursuant to its conspiracy with Epiq and TrusteSolutions, BMS continues to sell bankruptcy software services only in

combination with bankruptcy banking services, and charges the Estate no fee for those combined services other than a percentage of the amount in the bank account of the Estate. Currently, with certain later developed minimums, BMS and Rabobank charge fees at the rate of 1.75 percent, Epiq and its banks charge fees at the rate of 1.75 percent, and TrusteSolutions and its banks charge fees at the rate of 1.9 percent, of the amount in the bank account of the Estate.

G.    The Contracts of BMS and Rabobank with Crane

37.    Upon information and belief, on or before April 15, 2014, BMS entered into a contract with Crane.

38.    Upon information and belief, under Crane's contract with BMS, Crane promised to (i) deposit with Rabobank all, or substantially all, of the funds of any Estate for which Crane used BMS bankruptcy software services, and (ii) allow Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from Crane's Estate accounts at Rabobank.

39.    Upon information and belief, Rabobank thereafter entered into a contract with Crane.

40.    Upon information and belief, Crane's contract with Rabobank authorized Rabobank to automatically withdraw, without any approval of the Bankruptcy Court or notice to creditors, a monthly fee from Crane's Estate accounts.

41.    The contracts that Crane entered into with BMS and Rabobank applied to his subsequent appointments as a Trustee, even for Estates that did not exist at the time of the execution of the contracts with BMS and Rabobank.

H.     The Chapter 7 Petition of Integrated Genomics, Inc.

42.     On May 4, 2011, Integrated Genomics, Inc. ("Integrated") filed in the Bankruptcy Court for this District, as Case No. 11-19086, a petition under Chapter 7 of the Bankruptcy Code.

43.     Upon the filing of the petition of Integrated, the U.S. Trustee appointed Crane as the Chapter 7 Trustee of the Integrated Estate.

44.     On or before March 24, 2014, Crane deposited the funds of the Integrated Estate at Rabobank.

45.     Prior to the closing of the Integrated bankruptcy case, Rabobank deducted $514.16 from this account.  Rabobank never paid any interest on the funds in the account of the Integrated Estate.

46.      McGarry, an unsecured creditor of the Integrated Estate, received from the Integrated Estate $12,472.55 on McGarry's allowed claim of $78,308.94.

47.     Crane filed his final account and distribution report on April 14, 2014. Shortly thereafter, the Integrated case ended and the Integrated Estate closed.

48.     McGarry thereafter learned that Rabobank had deducted $514.16 from the Integrated Estate's account as a fee.

49.     Upon information and belief, Rabobank paid most, if not all, of this amount to BMS pursuant to their contract.

50.     Neither Rabobank nor BMS had any permission from the Bankruptcy Court to withdraw any funds from the Integrated Estate to pay either BMS or Rabobank.

51.     The amount that Rabobank deducted in fees and, upon information and belief, paid to BMS was greater than the amount of the fees that would have resulted in

10

the absence of the conspiracy. Absent the overcharge of BMS for bankruptcy software services resulting from the conspiracy, McGarry would have received a greater distribution from the Integrated Estate.

A FIRST CLAIM FOR RELIEF
(15 U.S.C. § 1 – Horizontal Conspiracy to Fix the Manner of Charging Fees)

52. McGarry repeats the allegations in paragraphs 1 to 51 above with the same force and effect as if set forth in full.

I.    Violation of 15 U.S.C. § 1

53. BMS, Epiq and TrusteSolutions conspired to sell Estates bankruptcy software services only in combination with bankruptcy banking services, and to charge Estates no fee for those combined services other than a percentage of the amount in the bank account of the Estate.

54. This conspiracy to fix the manner of charging fees for these services constitutes a *per se*, or alternatively a rule of reason, violation of 15 U.S.C. § 1.

A.    Direct Evidence of a Conspiracy

55. Upon information and belief, on or before January 14, 2011, BMS, Epiq and TrusteSolutions communicated directly about selling bankruptcy software services only in combination with bankruptcy banking services, and charging no fee to an Estate for those combined services other than a percentage of the amount in the bank account of the Estate.

56. Upon information and belief, on or before January 14, 2011, BMS sent a written proposal to Epiq that proposed that providers of bankruptcy software services, including BMS and Epiq, sell bankruptcy software services only in combination with bankruptcy banking services, and charge no fee to an Estate for those combined

11

services other than a percentage of the amount in the bank account of the Estate.
Upon information and belief, BMS directly or indirectly communicated this written
proposal, or the substance of it, to TrusteSolutions.

57. On or about January 14, 2011, Epiq responded to the proposal of BMS in
a document entitled "Chapter 7 Industry Comments," a copy of which is annexed as
Exhibit A. In that document, Epiq stated in part:

> "**Epiq Systems' Comments on Proposal by BMS / Bank of NY Mellon**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)] **This
> structure would promote future stability for trustees' activities, and it
> features well reasoned characteristics**:
>
> - the amount of the fee moves automatically with changes to market interest
>   rates
> - **the fee is assessed uniformly to all estate accounts**
> - the fee extinguishes itself automatically in normal interest rate
>   environments
> - **the fee is earmarked to support the technology and case
>   management services** on which trustees rely for the orderly
>   administration of their estates, and it is not a windfall for any market
>   participant
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
>
> **Epiq Systems' Proposal**
>
> [Content redacted by U.S. Trustee pursuant to 5 U.S.C. § 552(b)(4)]
>
> While this approach would not solve the problems that collateralized deposits
> create on banks' balance sheets, it would nevertheless avoid the pending
> disruption to estate administration that we believe may otherwise occur."
> (Emphasis added.)

Epiq provided a copy of this document to the U.S. Trustee on or about January 18,
2011. Upon information and belief, Epiq also provided a copy to BMS.

58.     On January 21, 2011, Texas Capital Bank, on behalf of itself and TrusteSolutions, proposed to the U.S. Trustee that the U.S. Trustee allow Trustees to pay from the funds of Estates a fee for combined bankruptcy software services and bankruptcy banking services based upon a percentage of the amount of money in the bank account of the Estate.  A copy of that proposal is annexed as Exhibit B.  In that proposal, Texas Capital Bank stated:

> "Due to the current interest rate environment financial institutions are able to secure deposits at virtually no operational cost.  The current UST program requires a high level of operational support, including banking support, software support and hardware support to bankruptcy trustees to remain in compliance with the UST requirements to administer bankruptcy estates that cannot be offset solely by the value of deposits maintained.  **Therefore TCB will need to assess to the bankruptcy estates a monthly Custodial Fee as a percentage of balances maintained to offset the operational support provided**.  Depending on the level of operational support required and the interest rate environment TCB will annually adjust the Custodial Fee accordingly." (Emphasis added.)

59.     Upon information and belief, Texas Capital Bank, acting on behalf of itself and TrusteSolutions, either directly or indirectly, communicated this information to BMS and Epiq.

B.      Circumstantial Evidence of a Conspiracy

Structure of the National Market for Bankruptcy Software Services

60.     The structure of the national market for bankruptcy software services facilitates collusion.  The services are homogeneous; the demand is inelastic; the prices charged to Estates for the services can be determined from publicly filed reports of Trustees; barriers to entry exist because of the software; and the number of competitors is small.

## Communications Between the Three Firms

61.     Upon information and belief, representatives of BMS, Epiq and TrusteSolutions are, and at all relevant times have been, in regular communication. Representatives of BMS, Epiq, and TrusteSolutions have attended conferences among Bankruptcy Judges, Trustees and attorneys.  Upon information and belief, representatives of BMS, Epiq, and upon information and belief, TrusteSolutions, have attended the bankruptcy related conferences sponsored by (i) The American Bankruptcy Institute, (ii) The National Conference of Bankruptcy Judges, and (iii) The National Association of Bankruptcy Trustees ("NABT").

62.     In or about July 25, 2012, the Chief Executive Officer of BMS, Steve Coffey ("Coffey"), and a representative of Epiq, Scott Field, Esq. ("Field"), appeared before the United States Bankruptcy Court for the Northern District of Ohio, in *In re Bradley & Michelle Dorfler, et al.*, Case No. 10-51411 (MSS) (Bnky. N.D. Oh.), to defend the fees of BMS.  The following ensued:

> "THE COURT: Okay. Mr. Coffey, you heard me – I'll make sure your counsel doesn't mind my asking you questions directly. You know, if I'm asking – if I start to veer into any trade secrets or confidential information, then simply say so.
>
> MR. COFFEY: I don't think there will be a problem. Mr. Field is in the room and **I don't think we had a lot of secrets between us so that's fine**." (Emphasis added.)

## Announcement of Non-Price Competition

63.     Upon information and belief, BMS, Epiq and TrusteSolutions do not compete based upon price.  In repeated filings with the Securities and Exchange Commission, Epiq disclosed that it did not compete in the market for bankruptcy software services based upon price. For example, in its Form 10K filed February 25,

14

2011, Epiq represented that it did not compete in the market for bankruptcy software

services based upon price, stating:

"**eDiscovery**

The e-discovery market is highly fragmented, intensely competitive and rapidly evolving. Competitors include Electronic Evidence Discovery, Inc., Fios, Inc., Kroll Ontrack (Altegrity Inc.), Attenex (FTI Consulting, Inc.), Autonomy ZANTAZ, Inc., Stratify, Inc. (Iron Mountain Incorporated), and Clearwell Systems, Inc. **Competition is primarily based on the quality of service, technology innovations, and price**.

**Bankruptcy**

Our bankruptcy segment competes in a more mature market. We are one of two primary providers in the Chapter 7 bankruptcy market, along with Bankruptcy Management Solutions, Inc.; and in the Chapter 11 bankruptcy market competitors include Kurtzman Carson Consultants LLC and The Garden City Group, Inc. In both the Chapter 7 and Chapter 11 markets there are also several smaller competitors. **Competition is primarily based on quality of service and technology innovations**. Competitors for our AACER® product include American InfoSource and LexisNexis® Banko® Solutions.

**Settlement Administration**

The primary competitors with our settlement administration segment are The Garden City Group, Inc., Rust Consulting, Inc., and Gilardi & Co LLC, as well as several smaller competitors. **Competition is primarily based on the quality of service, technology innovations, and price**." (Emphasis added.)

64.     Shortly after the decision of the U.S. Trustee to allow Trustees to pay

service fees from Estate accounts, BMS publicly announced that it would not negotiate

concerning fees with Trustees.  BMS stated in a document that it publicly distributed in

or about June 2011:

"**Is the Service Fee Negotiable?**

**A.** No. In order to provide equal treatment in all bankruptcy cases, the Services Fee is based on a uniform rate as set forth above and is a condition of participation in the BMS program."

65.     Upon information and belief, BMS, Epiq and TrusteSolutions have refused to negotiate concerning fees with Trustees, with the exception of the limited discussions involving a small group of Trustees in this District in or about late 2011, described in paragraphs 70 and 71 below.

66.     BMS has publicly encouraged Epiq and TrusteSolutions to refuse to submit their fees to the Bankruptcy Court for approval on a per case basis.  In *In re Nanodynamics, Inc.*, Case No. 09-13438 MJK (W.D.N.Y.), Coffey of BMS testified in a declaration dated and filed September 12, 2011:

> "20.     Finally, I would like to address another issue that was raised at the August 31, 2011 hearing with regard to the pricing for BMS Services. At the hearing, the Court noted that:
>
> > *'I do feel that the business model, pricing, in light of what you said, that's not based on monthly activity, it's not based on the burdens upon the service providers, it's based simply upon how many dollars are in an account . . . .'*
>
> [Transcript, 30:21- 31:2].
>
> 21.     The Court's observation is essentially correct, but that should not affect the allowance of the BMS Service Fee as an administrative expense, for at least three reasons…. Where, as here, the trustee in the exercise of his discretion has determined that the foregoing requirements are satisfied, I am not aware of anything that requires that a claim be measured by any particular method, such as the (a) cost to the provider of providing the service; (b) the amount of the service actually used by the estate each day; or (c) the price at which a competitor might be willing to offer a similar product, albeit with a lower quality of service. If it were otherwise, then administrative expenses for things like a trustee's compensation under section 326(a), the UST's quarterly fees, or even the rent paid by a trustee for a facility to store estate property, would all be subject to retrospective revaluation on an individual case basis. **I would submit that under such a regime, few, if any, parties would be willing to do business with a chapter 7 trustee; BMS and BNY Mellon certainly would not**.
>
> 22.     Second, the BMS 'flat' percentage fee structure exists for a reason, much like the rate structures for trustee compensation, UST quarterly fees, and, say monthly premises rent, are 'flat fee' based, rather than being based [on] use

16

or activity levels. The reason is that no other structure is administratively feasible. BMS and BNY Mellon do business with hundreds of trustees across the nation, who collectively handle more than 50,000 'asset' cases currently (in addition to hundreds of thousands of 'no asset' cases annually), it would be utterly impractical for BMS and BNY Mellon to negotiate hundreds, or thousands, of 'one-off deals' with individual trustees, based on the facts and circumstances of each case; the costs of evaluating, negotiating and monitoring so many unique contracts would by themselves be prohibitive, to both the trustees and to BMS and BNY Mellon. **While the trustee services business may, if this interest rate environment continues, ultimately evolve to a different model, where pricing is based on a set schedule of fees and charges for numbers and types of transactions, at this point, that is simply not a business model that BMS and BNY Mellon are prepared to offer. When and if any other providers are willing to offer services under such a model, trustees of course have the ability to terminate their arrangements with BMS and BNY Mellon on 30 days notice, and to contract with such providers**, to the extent that the trustees believe that they should do so in accordance with the exercise of their fiduciary duties." (Emphasis added.)

67.     On or about January 12, 2016, Jill Bauer, Managing Director of Trustee and Fiduciary Services for Epiq, executed a declaration that BMS filed in *In re On-Site Sourcing, Inc.*, Case No. 09-10816 (RGM) (Bnky. E.D. Va.), that confirmed that bankruptcy software service providers competed only in terms of market share and not in terms of the manner of charging fees, stating in part:

"I also agree that compensation issues challenging our industry have necessitated service providers to transition to alternative pricing models while also actively and aggressively competing with one another to capture market share."

<u>Refusing to Charge Separately Despite Pressure from Bankruptcy Courts</u>

68.     BMS, Epiq and TrusteSolutions continued to sell Estates only combined bankruptcy software services and bankruptcy banking services, despite the pressure from certain Bankruptcy Courts to sell and charge for bankruptcy software services separately.

69.     Beginning in the summer of 2011, Bankruptcy Courts in at least four districts throughout the United States, including this District, addressed the issue of whether Trustees should pay combined fees for bankruptcy software services and bankruptcy banking services from Estate accounts.

70.     In *In re Canopy*, Case No. 09-44943 (ERW) (Bnky. N.D. Ill.), the Bankruptcy Court's transcript of November 8, 2011, provided the following exchange between the Bankruptcy Court and Trustee Gus Paloian ("Paloian"), concerning the need to charge separately for, or unbundle, the bankruptcy software services and bankruptcy banking services:

> "MR. PALOIAN: And so what we face now are the bundled services of Epic plus a bank.
>
> THE COURT: Okay. **I think what we need is to unbundle it**.
>
> MR. PALOIAN: Yeah, exactly, Judge. I couldn't agree more. I've tried to do this. I've had these discussions. We're not necessarily at the point. I have not been able to get a direct quote for just trustee/Epic software services."  (Emphasis added.)

71.     To date, upon information and belief, Paloian still has not obtained bankruptcy software services apart from bankruptcy banking services from BMS, Epiq or TrusteSolutions.

<u>Withdrawal of Services in the Western District of New York</u>

72.     On September 7, 2011, the Bankruptcy Court for the Western District of New York entered a standing order that vacated its prior order of June 7, 2011.  The June 7, 2011, order had given blanket approval for the payment of a combined fee for bankruptcy software services and bankruptcy banking services. The September 7,

2011, order provided that charges for bankruptcy software services would be determined on a per case basis under 11 U.S.C. § 328, or any other applicable statute.

73.     On October 31, 2011, BMS announced that it would withdraw, and later withdrew, from providing bankruptcy software services to Trustees located in the Western District of New York.   Upon information and belief, BMS did not attempt before withdrawing from that District to charge for its bankruptcy software services apart from bankruptcy banking services, or to seek approval for its fees in the manner that 11 U.S.C. § 328 provides.

74.     If BMS had provided bankruptcy software services to Trustees in the Western District of New York, and sought approval of its fees as an administrative expense as 11 U.S.C. § 328 provides, BMS would have earned revenue from cases pending in the Western District of New York.  Rather than provide bankruptcy software services, seek compensation for those services pursuant to 11 U.S.C. § 328, and earn revenue from bankruptcy cases pending in the Western District of New York, BMS refused to provide those services in the Western District of New York.  The decision of BMS to refuse to provide those services in the Western District of New York in these circumstances would have been contrary to the economic interests of BMS, but for its conspiracy described above.

75.     Upon information and belief, since January 2011, neither BMS, Epiq, nor TrusteSolutions has charged separately for bankruptcy software services.

<u>Excessive Prices</u>

76.     Upon information and belief, BMS charged prices greater than the prices that it would have been able to charge absent the unlawful conspiracy.

77.     Trustees have stated that the amounts that bankruptcy service providers charge are excessive.

78.     On or about February 16, 2011, a liaison committee of the NABT represented in substance to the U.S. Trustee that a fee based upon an annual rate of 3% of the money in the bank account of the Estate would be excessive:

"- **A 3% annual fee is excessive**.  3% is essentially the trustee fee on a large estate, which is typically earned over a number of years (assuming, hypothetically, three years, the bank depository fee would be 9% while the trustee commission for services rendered is limited to 3%).
- Depositories would receive a windfall on multi-million dollar estates.
- Even in small estates, where disputes (ie, appeals) result in the estate remaining open a number of years, the depository fee can easily dissipate 10 - 15% of the assets of the estate." (Emphasis added.)

79.     On or about August 11, 2011, a Trustee from the District of Arizona wrote to the members of the NABT:

"Somehow it sort of feels like we are being taken to the cleaners and can't do anything about it. We have become so dependent on the software that they can charge just about anything they want and what are we to do about it. Seems to me we need a REGULATOR to handle this and in my mind it should be the US Trustee. They need to step up and prevent this monopolizing by the BIG THREE and tell them what THEY think is a reasonable charge and that should be universally.  An annual fee which we can spread among the estates pro rata like we do for the bond. **This is a train robbery and our creditors are the ones that are being taken advantage of**. While we get $60 a case, The BIG THREE (Epiq, BMS and Trustees Solution [sic]) gets to make hundreds of dollars per trustee per year just for providing SOFTWARE?  Something doesn't seem equitable!" (Emphasis added.)

80.     On or about November 2, 2011, a Chapter 7 Trustee from this District wrote to the NABT:

"The problem is that we are looking in the wrong place for a solution.  The problem is we need software and support to keep track of our cases and do our reports.  We don't need computers, printers, monitors, scanners, etc. from the software vendor.  If the former model that provided all those perks is no longer sustainable, then we need to unbundle the package and pay for that which we need, not that which we want.  The discussion should be with the software

vendors to unbundle and do away with the dedicated banking relationships. **There is little to recommend our continued commitment to the banks, given their reaction to the problem and their opportunistic pricing which seems far beyond anything that is reasonably tied to their costs. (I have a case with $12 million in it and I simply do not think it costs BofA $60,000 to service that case)**." (Emphasis added; original emphasis removed.)

81.     Epiq has advised the Administrative Offices of the U.S. Courts that a fee of 0.50% to 0.75% would be reasonable except in unique situations. In a memorandum to the Administrative Offices of the U.S. Courts, Field of Epiq wrote on April 2, 2012:

> "Banks will not enter in to this business and wait for an order in the future authorizing the fee on a case-by-case basis or possibly risk disgorgement should a court determine them unreasonable. This does not mean that the judiciary needs to authorize the fees presently being charged by banks. **The courts could authorize some smaller number they feel is 'reasonable' (such as 0.50% to 0.75%) and then allow a bank to request a higher amount for unique situations**." (Emphasis added.)

II.     Standing

82.     McGarry meets the constitutional requirements for standing because (i) McGarry has sustained an injury in the form of an overcharge for bankruptcy software services (ii) attributable to the violation of 15 U.S.C. § 1, because BMS has eliminated competition in the manner of charging for its services, (iii) that a monetary judgment in this action could remedy.

83.     McGarry meets the statutory requirements for standing because Congress intended that McGarry, and those similarly situated, would have a cause of action under 15 U.S.C. § 1 in these circumstances.  McGarry is within the zone of interests that § 1 seeks to protect.  The statute seeks to prevent injuries that result from the reduction of competition. McGarry sustained an injury because BMS charged excessive fees to Estates for bankruptcy software services.  In addition, the violation of the statute was a

proximate cause of the damages McGarry sustained. No one is any closer to the damages that BMS caused than McGarry, and those similarly situated.

84. McGarry will efficiently enforce the antitrust law.

85. The amount of damages that McGarry has sustained is readily calculable, once the trier of fact determines the amount of damages resulting from the unlawful conspiracy, because those damages do not depend upon the expenses of the Trustee or any other party.

III. <u>Damages</u>

86. As a result of the anti-competitive activities of BMS in violation of 15 U.S.C. § 1 described above, McGarry has sustained damages to its business and property in an amount to be determined by the trier of fact in this action.

87. McGarry is entitled to recover treble damages, and attorneys' fees pursuant to 15 U.S.C. § 15.

A SECOND CLAIM FOR RELIEF
<u>(740 ILCS 10/3 – Horizontal Conspiracy to Fix the Manner of Charging Fees)</u>

88. McGarry repeats the allegations set forth in paragraphs numbered 1 to 85 above with the same force and effect as if set forth in full.

89. As a result of the anti-competitive activities of BMS in violation of 740 ILCS 10/3, McGarry has sustained damages to its business and property in an amount to be determined by the trier of fact in this action.

90. Under 740 ILCS 10/7, McGarry is entitled to recover treble damages and attorneys' fees.

<u>Class Action Allegations</u>

91.     McGarry repeats the allegations set forth in paragraphs numbered 1 to 90 above with the same force and effect as if set forth in full.

92.     McGarry is bringing this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of itself and a class of persons similarly situated.

93.     The class is defined as persons who received, or are entitled to receive, proceeds of an Estate that paid fees to BMS, excluding (a) Trustees who have a contract with BMS, (b) creditors who have received 100% of their claim, (c) for purposes of the second claim only, persons not entitled to assert a claim under the state statute identified in that claim, and (d) the judicial officers adjudicating this action and any member of their immediate families.

94.     The class is sufficiently numerous that joinder of all members is impracticable. Upon information and belief, the class is comprised of at least hundreds of persons.

95.     There are questions of law and fact common to the class.  These questions include, among others: Did BMS enter into an unlawful conspiracy with Epiq and/or TrusteSolutions in violation of 15 U.S.C. § 1?

96.     The claims of McGarry are typical of the claims of the class.

97.      McGarry will fairly and adequately protect the interests of the class.  The interests of McGarry are coincident with those of the remainder of the class.  McGarry is represented by competent counsel.

98.     The questions of law and fact common to the class members predominate over any questions affecting only individual members, and a class action would be

superior to other available methods for fairly and efficiently adjudicating the controversy.

WHEREFORE, McGarry, individually and on behalf of those similarly situated, demands judgment against BMS:

(a)     Awarding judgment for compensatory damages in an amount to be determined by the trier of fact in this action;

(b)     Awarding judgment for treble damages;

(c)     Upon certification of a class consisting of members whose Estates have been overcharged, but who have not yet received a distribution from those Estates, declaring that the alleged conspiracy is unlawful, until the effects of the conspiracy have been purged;

(d)     Awarding costs, including attorneys' fees in this action pursuant to 15 U.S.C. § 15, and 740 ILCS 10/7, or otherwise; and

(e)     Granting such other and further relief as to the Court seems just and proper.

DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the Constitution of the United States, McGarry hereby demands a trial by

jury of all issues that are so triable.

Dated:  September 14, 2016

/s/ Marianne C. Holzhall
Marianne C. Holzhall (#6204057)
(mch@mcgarryllc.com)
120 North LaSalle Street, Suite 1100
Chicago, Illinois 60602
(312) 345-4600

Attorney for Plaintiff

Dunnegan & Scileppi LLC
350 Fifth Avenue
New York, New York 10118
(212) 332-8300,

Of Counsel.